IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TELENA MOSER, Personal Representative of the ESTATE OF TERRY L. BERRY, JR., Deceased,<br><br>        Plaintiff,<br><br>vs.<br><br>SCOTT FRAKES, Director of the Nebraska Department of Correctional Services, in his individual capacity;<br>BRAD HANSEN, Warden of Tecumseh State Correctional Institution, in his individual capacity; and<br>JOHN/JANE DOES 1-6, all employees of Tecumseh State Correctional Institution, in their individual capacities,<br><br>        Defendants. | Case No. _____<br><br><br><br><br><br><br><br>**COMPLAINT, JURY DEMAND AND REQUEST FOR PLACE OF TRIAL** |

COMES NOW Telena Moser, Personal Representative of the Estate of Terry L. Berry, Jr., Deceased, by and through her counsel of record, and for her causes of action against Defendants, states as follows:

## JURISDICTION, VENUE and PARTIES

1.    This Court has jurisdiction pursuant to the provisions of 28 U.S.C. §§1331 and 1333 and 42 U.S.C. §1983.

2.    Venue for this action is proper in the United States District Court for the District of Nebraska because the acts and omissions complained of herein occurred in Tecumseh, Johnson County, Nebraska.

3.    Plaintiff Telena Moser is the duly-appointed Personal Representative of the <u>Estate of Terry L. Berry, Jr.</u>, PR 17-1088, Probate Court of Douglas County, Nebraska, and is a resident of Sarpy County, Nebraska.

4. Defendant Scott Frakes ("Frakes") is and was at all times relevant the Director of the Nebraska Department of Correctional Services ("NDCS"). He is sued in his individual capacity.

5. Defendant Brad Hansen ("Hansen") was, at all times relevant, the Warden of the Tecumseh State Correctional Institution ("TSCI"). He is sued in his individual capacity.

6. Together, Hansen and Frakes were the policymakers and final decision-makers for TSCI at all relevant times, and were responsible for articulating, training, and ensuring compliance with official and unofficial policies for the protection of inmates and any other person inside the secured area of the facility.

7. DOES 1-10 are and/or were at all relevant times employed by the Nebraska Department of Correctional Services as employees or contractors at TSCI. Each of these Defendants is sued in their individual capacities.

8. All actions and inactions alleged herein were done under color of state law.

## FACTUAL BACKGROUND

### *PERVASIVE OVERCROWDING AND UNDERSTAFFING IN NDCS FACILITIES*

9. According to its own report, NDCS was operating at approximately one hundred and sixty percent (160%) of its design capacity in 2017.

10. According to this same report, TSCI was operating at approximately one hundred and seven percent (107%) of its design capacity in 2017.

11. TSCI has a design capacity of 960 inmates.

12. In 2015, the Vera Institute of Justice (Vera) began to work with NDCS to curb its overuse of segregated housing.

13. Vera issued a Report on November 1, 2016, which stated that Nebraska's prison system was "one of the most severely overcrowded prison systems in the United States", and noted that "prison overcrowding adversely affects the health, behavior, and morale of incarcerated people and creates managerial problems and occupational health hazards for correctional staff. For instance, overcrowded prison conditions are associated with [. . .] increased risk of self-injurious behavior and suicide, and incidents of violence."

14. Prior to and on April 15, 2017, Defendants Frakes and Hansen knew NDCS and TSCI to be chronically overcrowded.

15. Overcrowding increases the risk of tension, assaults, and other disturbances resulting in serious injury and death, a fact that was foreseeable to Defendants Frakes and Hansen before April 15, 2017.

16. In addition to being overcrowded, NDCS and TSCI, in particular, have been chronically understaffed.

17. The Vera Report acknowledged TSCI's inadequate staffing, and stated that, "[u]nderstaffing and frequent staff turnover at NDCS are likely due to a number of factors, including the location of some facilities far from population centers, a pay structure that is uncompetitive and does not reward longevity, and stressful and perilous work environments due to overcrowding and lack of resources."

18. On April 15, 2017, NDCS and TSCI, in particular, suffered from understaffing, high employee turnover, and mandatory overtime.

19. In addition to a shortage of protective services staff, TSCI was short caseworkers who are responsible for developing a rapport with inmates.

20. Unit caseworkers have a number of duties, including the observation of inmates to detect abnormalities, problems, or unrest, and the counseling of inmates in assisting them to adapt to the prison environment.

21. Every day from the Vera Report on November 1, 2016, to April 15, 2017, Defendants Frakes and Hansen knew NDCS and TSCI, in particular, to have inadequate staff to manage their overcrowded inmate population.

22. Inadequate staffing increases the risk of tension, assaults, and other disturbances resulting in serious injury and death, a fact that was foreseeable to Defendants Frakes and Hansen before April 15, 2017.

23. As part of their duties and within the scope of their employment with the State of Nebraska, Defendants Frakes and Hansen were responsible for staffing levels of TSCI and for overseeing the inmate population levels within TSCI.

### *UNSAFE CONDITIONS AND VIOLENT INCIDENTS AT TSCI*

24. In addition to the overcrowding and understaffing that permeates NDCS, conditions at TSCI fomented a more specific unsafe environment that erupted multiple times into violent incidents resulting in numerous deaths in recent years.

25. TSCI in particular has a history of violent assaults resulting from, at least in part, inadequate staffing and overcrowding.

26. Specifically, on Mother's Day in 2015, a riot broke out among TSCI inmates.

27. It took nearly ten hours for correctional officers and state troopers to regain control of the housing unit.

28. By that time, two inmates had been killed, two correctional staff members were injured, and TSCI sustained more than $2 million in property damage.

29. The "Mother's Day Riot" was extensively investigated by NDCS, law enforcement, the Nebraska Legislature and the media.

30. Those investigations identified deficiencies in staffing and in NDCS's response to the outbreak, including failure to protect inmates from assault and murder during the riot.

31. Those investigations also identified conditions that led to the Mother's Day Riot, such as overcrowding.

32. Defendants Frakes and Hansen were aware of all of the findings of those investigations, and of the urgent need to correct the identified deficiencies in order to prevent future riots.

33. Then on March 2, 2017, another riot erupted at TSCI when inmates rioted and set a fire.

34. More than three-and-a-half (3½) hours passed before this riot was brought under control.

35. By that time, another two inmates had been killed, and TSCI suffered significant damage.

36. The "March 2017 Riot" was highly scrutinized by the media and lawmakers, who suggested that overcrowding and understaffing were factors in, and/or responsible for, the rioting resulting in the deaths of two inmates.

37. This riot further put the Defendants Frakes and Hansen on notice of the security issues at TSCI.

38. Every day from the Mother's Day Riot to the March 2017 Riot to April 15, 2017, Defendants Frakes and Hansen knew that conditions of overcrowding and understaffing persisted, and would continue to cause an ongoing, constant and substantial risk of serious and avoidable pain, suffering, injury and death, to TSCI inmates.

39. Due to overcrowding and inadequate staffing, NDCS and TSCI staff, as supervised and administered by Defendants Frakes and Hansen, engaged in the overuse of segregation, including restrictive housing units.

40. Restrictive housing is defined by Neb. Rev. Stat. § 83-170(13) as "conditions of confinement that provided limited contact with other offenders, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week."

41. The purpose of restrictive housing is to separate a violent inmate from the general population or to separate an inmate at risk of violence from the general population.

42. In 2017, NDCS's rules and regulations, NAC Title 72, Section 003.02(A), required all restrictive housing placements to be based on one of the following six categories:

   a. A serious act of violent behavior (i.e., assaults or attempted assaults) directed at correctional staff and/or at other inmates;
   b. A recent escape or attempted escape from secure custody;
   c. Threats or actions of violence that are likely to destabilize the institutional environment to such a degree that the order and security of the facility is significantly threatened;
   d. Active membership in a "security threat group" (prison gang), accompanied by a finding, based on specific and reliable information, that the inmate either has engaged in dangerous or threatening behavior directed by the security threat group, or directs the dangerous or threatening behavior of others;
   e. The incitement or threats to incite group disturbances in a correctional facility; and
   f. Inmates whose presence in the general population would create a significant risk of physical harm to staff, themselves and/or other inmates.

43. Restrictive housing is to be used as a last resort, with staff utilizing alternatives to restrictive housing in every case possible, per NAC 72-004.01.

44. The Vera Report determined that "severe overcrowding, a shortage of corrections and mental health staff, and insufficient educational, vocational, and therapeutic programming and mental health treatment for incarcerated people" at NDCS facilities had led to an overuse of segregation, including restrictive housing.

45. In its goal to decrease the overuse of segregation at NDCS, Vera put forward multiple recommendations to NDCS, including but not limited to:

   a. Improve the conditions of confinement in restrictive housing units to reduce the negative effects of segregation, including by increasing out-of-cell time and recreation, minimizing isolation and idleness, and providing opportunities for rehabilitative programming;

   b. Expand vocational, educational, and therapeutic programming and activities for the entire population, including those in restrictive housing.

46. As of April 15, 2017, Defendants Frakes and Hansen knew that the conditions of restrictive housing required the increase of out-of-cell time and recreation, the minimization of isolation and idleness, and provision for rehabilitative programming opportunities.

47. As of April 15, 2017, Defendants Frakes and Hansen knew that the conditions of restrictive housing required an expansion of vocational, educational, and therapeutic programming and activities for the inmate population, including those in restrictive housing.

48. Isolation from the general population, as well as a lack of recreational, vocational, educational, and therapeutic programming, increases the risk of tension, assaults, and other disturbances resulting in serious injury and death, a fact that was foreseeable to Defendants Frakes and Hansen before April 15, 2017.

49. As part of its management of excessive overcrowding, TSCI staff, as supervised by Defendants Frakes and Hansen, engaged in the practice of double bunking inmates in restrictive housing cells.

50. The Vera Report stated that whenever double-celling was employed by NDCS, "always ensure that individuals are carefully matched to minimize the risk of dangerous situations."

51. NDCS's Administrative Regulation 210.01(VIII) details the process by which inmates in restrictive housing may share a single cell.

52. As part of that process, various unit managers and unit case managers are to confer after reviewing a classification study, classification/reclassification action form, PREA (Prison Rape Elimination Act) documents, and Security Threat Group documents regarding each inmate considered for the same cell.

53. Correctional staff are required to consider, at minimum, the following items:

a. History of assaultive behavior

b. Reason for Segregation/Restrictive Housing status

c. Central Monitoring

d. PREA Score (aggression/vulnerability)

e. Security Threat Group affiliation

54. After considering the above items, staff members are to determine the most appropriate housing location for inmates assigned to a restrictive housing status and to then complete a form titled Restrictive Housing Assignment of Living Location.

55. Section VIII(G) of Administrative Regulation 210.01 provides that, if a decision is made to double bunk two inmates, "the persons making the decision **shall** state in writing why, at the time of the cell assignment, the cell assignment provides each cellmate with reasonable safety from assault."

56. Consequently, the above requirement for making a written statement regarding reasonable safety from assault is mandatory, rather than a discretionary function, when bunking more than one inmate in a cell.

57. Due to excessive overcrowding and chronic understaffing, TSCI staff, as supervised by Defendants Frakes and Hansen, engaged in the use of double bunking inmates in restrictive housing units without following the proper procedure for placement.

58. On April 15, 2017, Defendants knew that NDCS and TSCI double bunked inmates in restrictive housing units without following proper protocol, due to excessive overcrowding and chronic understaffing.

59. Double bunking inmates in restrictive housing, without following proper procedure for placement, increases the risk of tension, assaults, and other disturbances resulting in serious injury and death, a fact that was foreseeable prior to April 15, 2017.

### *SPECIFIC RISK OF BERRY DOUBLE-BUNKING, RESULTING IN HIS DEATH*

60. On November 20, 2015, Terry L. Berry, Jr. ("Berry") entered the custody of NDCS after being convicted of two charges, 2nd Degree Forgery and Assault by a Confined Person.

61. Berry was sentenced to three to four years, and his parole eligibility date was February 23, 2017. His tentative release date was December 8, 2017.

7

62. On August 31, 2006, Patrick W. Schroeder ("Schroeder") entered the custody of NDCS after being convicted of First Degree Murder, Use of a Deadly Weapon to Commit a Felony, and six counts of Second Degree Forgery.

63. Specifically, Schroeder had robbed a 75-year old man, brutally murdered him, and dumped his body in an abandoned well, reportedly because he was "tired of pinching pennies".

64. In April 2017, Schroeder was serving a life sentence and was known by staff at TSCI as having a bad temper.

65. As of that date, Schroeder had been living at TSCI since 2007, and an extensive amount of that time was spent in restrictive housing.

66. Berry was also known for his behavior and was identified as needing anger management programming.

67. Berry was placed on a waiting list in March 2016, but never did receive anger management programming.

68. On April 10, 2017, Doe 1 requested Schroeder to move out of his cell to a different unit.

69. Schroeder was told by Doe 1 he would be double bunked with another inmate if he refused the request to move, although Schroeder informed Doe 1 that he, Schroeder, would not accept double bunking.

70. About fifteen (15) minutes before he was to move into his new cell, Schroeder was informed that his cellmate would be Berry.

71. Schroeder informed Doe 2 that double bunking with Berry was unacceptable because he knew Berry to have enemies, was talkative and was believed to be dirty.

72. However, Schroeder was informed that the decision had been made and would not be changed.

73. Also on April 10, 2017, Berry was informed by Doe 3 that he would be moving cells that day, and was informed that if he refused the move, Berry would be double bunked with another inmate.

74. Two unit managers of TSCI, Does 4 and 5, were responsible for making the joint decision to double bunk Berry and Schroeder in restrictive housing.

75. The decision to double bunk Schroeder and Berry by Does 4 and 5 was due to overcrowding, as no single occupancy cells were available in the unit.

76. On information and belief, it was not considered by Does 4 and 5 that Berry was days away from his parole hearing at which he would likely be released, and that Schroeder was serving a life sentence.

77. Further, Does 4 and 5 did not complete the compatibility assessment until after each inmate was warned that they would be double bunked with another inmate if they did not comply with the directive to move cells.

78. Finally, Does 4 and 5 failed to complete the statement required by Administrative Regulation 210.01, wherein they were required to state why the cell assignment provides each cellmate with reasonable safety from assault.

79. In short, Does 1-5 did not follow proper procedure required by Administrative Regulation 210.01(VIII)(G), thereby facilitating an environment in which a subsequent assault is more likely to occur.

80. Further, the investigation of the Office of Inspector General of the Department of Correctional Services discovered that Doe 2 knew that Schroeder did not want to have a cellmate and had actual knowledge of a dangerous condition if Schroeder and Berry shared a cell.

81. Doe 2 expressed her concerns regarding the placement, stating that she "personally felt that it was not the best idea" since Berry "was known to be very talkative and bothersome", and that Schroeder "in for life, with a temper would not want someone like" Berry as a cellmate.

82. Doe 2 contacted the Lieutenant, Doe 6, but was informed "there wasn't much that could be done unless she called the person responsible for making the decision at their home."

83. Doe 2 separately expressed her concerns to two other staff members.

84. Despite Schroeder's express objections, Doe 2's explicit knowledge of the dangerous condition, and Doe 2's explicit warning to her supervisor Doe 6 and others, Schroeder and Berry were placed in the same restrictive housing cell on April 10, 2017.

85. For five days, between April 10 and April 15, 2017, none of the Defendants reviewed Berry's placement with Schroeder to ensure Berry reasonable safety from assault, despite specific knowledge of the risk posed by placing them in the same cell.

86. On April 15, 2017, Schroeder found Berry's mere talking intolerable, and Schroeder proceeded to assault Berry.

87. Schroeder wrapped his arm around Berry's neck and squeezed for five minutes. He then retrieved a towel and twisted it around Berry's neck until he felt certain Berry was dead.

88. Schroeder then attempted to alert prison staff, but no one responded until a routine check.

89. On April 15, 2017, TSCI staff attempted CPR and then sent Berry to the Johnson County Hospital in Tecumseh, Nebraska before he was transported to Bryan Health West Campus in Lincoln, Lancaster County, Nebraska.

90. On April 17, 2017, doctors at Bryan Health declared Berry brain dead.

91. On April 19, 2017, Berry was taken off of life support at which time he died.

92. An autopsy confirmed the cause of death to be asphyxia due to external compression of the neck structures (strangulation), and the manner of death to be homicide.

## FIRST CAUSE OF ACTION
## EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

93. Plaintiff incorporates the foregoing paragraphs 1- 92, as if fully set forth herein.

94. When Berry was incarcerated under Defendants' supervision and custody, they were obligated to take reasonable measures to guarantee his safety and to protect him from violence at the hands of other inmates.

95. Defendants subjected Berry to a substantial risk of serious harm, *to wit*:
   a. Defendants' failure to adequately respond to objective warnings of serious risk to inmate life and safety following the Mother's Day Riot and the March 2017 Riot;
   b. Defendants' failure to follow accepted standards regarding single-cell occupancy;
   c. Defendants' failure to provide increased out-of-cell time and recreation, a minimization of isolation and idleness, and rehabilitative programming opportunities, such as anger management programming, for restrictive housing inmates, including Berry;
   d. Defendants' failure to complete required and necessary protocols when double bunking inmates in restrictive housing, including the written statement portion of the "Restrictive Housing Assignment of Living" worksheet requesting to state in writing why, at the time of the cell assignment, the cell assignment provides each cellmate with reasonable safety from assault;

    e. Defendants' failure to heed Schroeder's express objections that double bunking with Berry would not work for him;

    f. Defendants Frakes's and Hansen's failure to adequately train, monitor and supervise TSCI staff to ensure that proper protocol were followed in housing decisions;

    g. Defendants' failure to heed Doe 2's objections to the placement of Schroeder and Berry in the same restrictive housing cell;

    h. Defendants' failure to consider, and/or willful ignorance of, Schroeder's substantial history of violent assault when assessing his compatibility with Berry;

    i. Defendants' failure to consider, and/or willful ignorance of, Berry's proximity to being released on parole and/or his tentative release date when determining to double bunk Berry with Schroeder;

    j. Defendants' decision to double bunk Schroeder and Berry;

    k. Defendants' failure to staff TSCI with enough personnel, including unit caseworkers, to provide observation of inmates to detect abnormalities, problems, or unrest, and the counseling of inmates in assisting them to adapt to the prison environment, including inmates Berry and Schroeder;

    l. Defendants' failure to curb excessive overcrowding to minimize the utilization of double bunking in single-cell, restrictive housing;

    m. For a period of five days following the decision to double bunk Berry and Schroeder, Defendants' failure to investigate Doe 2's specific warning; and

    n. Other acts and/or omissions to be determined at trial or other dispositive hearing.

96. Defendants had actual knowledge of each of these risks, but disregarded or acted with deliberate indifference to Berry's safety.

97. By the failures enumerated above, Defendants failed to act in good faith and without malice toward Berry's constitutional rights.

98. Based on the foregoing acts and/or omissions, Berry suffered physical, mental and emotional injury, to include the loss of his life.

99. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including Berry.

100. As a result of Defendants' actions as alleged herein, Plaintiff has been required to retain the services of attorneys and is entitled to a reasonable amount for attorney's fees pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

101. **<u>Plaintiff requests that this matter be tried to a jury in Omaha, Nebraska.</u>**

WHEREFORE, Plaintiff requests the Court find that the Defendants herein were deliberately indifferent to the safety of Terry Berry based on the foregoing allegations of acts and/or omissions; enter judgment in favor of the Plaintiff in the following amounts:

A. Compensatory damages in an amount to be proven at trial, for Berry's physical, emotional and mental injuries and pain and suffering;

B. Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

C. Reasonable attorney's fees;

D. The costs of this action;

E. Additional damages as are proven at trial; and

F. Such other relief as this Court deems equitable and proper.

DATED November 26, 2018

TELENA MOSER, Personal Representative of the Estate of TERRY L. BERRY, JR., Plaintiff

By: */s/ Thomas J. Monaghan*
Thomas J. Monaghan, #12874
Rodney C. Dahlquist, Jr., #23912
Dornan, Troia, Howard, Breitkreutz & Conway PC, LLO
1403 Farnam Street, Suite 232
Omaha, NE 68102
(402) 884-7044
(402) 884-7045 fax
Tom@dltlawyers.com
Rodney@dltlawyers.com
Attorneys for Plaintiff