# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TELENA MOSER, Personal Representative of the Estate of Terry L. Berry, Jr., Deceased;<br><br>              **Plaintiff,**<br><br>    vs.<br><br>SCOTT FRAKES, Director of the Nebraska Department of Correctional Services, in his individual capacity; BRAD HANSEN, Warden of Tecumseh State Correctional Institution, in his individual capacity; JOANN HELTON, in her individual capacity; ATHENA G BROWN, in her individual capacity; TODD R HAUSSLER, in his individual capacity; DUSTIN H. GUSTAFSON, in his individual capacity; and JOHN/JANE DOES 1-2, employees of Tecumseh State Correctional Institution, in their individual capacities;<br><br>              **Defendants.** | 8:18CV551<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion to Dismiss, ECF No. 29, filed by Defendants Scott Frakes and Brad Hansen and on the Motion to Dismiss, ECF No. 35, filed by Defendants Athena Brown, Dustin Gustafson, Todd Haussler, and Joann Helton. For the reasons stated below, the Motion filed by Frakes and Hansen will be granted, and the Motion filed by Brown, Gustafson, Haussler, and Helton will be denied.

## BACKGROUND

The following facts are those alleged in the Amended Complaint, ECF No. 20, and assumed true for purposes of the pending Motions to Dismiss.

On April 10, 2017, two Tecumseh State Correctional Institution (TSCI) unit managers, Defendants Athena Brown and Todd Haussler, decided to "double bunk" two inmates, Terry Berry and Patrick Schroeder, in a restrictive housing unit[1] that had no single-occupancy cells available. Am. Compl. ¶ 78-79, ECF No. 20, Page ID 89. Five days later, on April 15, 2017, Schroeder fatally assaulted Berry in their cell.

Berry entered the custody of the Nebraska Department of Correctional Services (NDCS) and was placed at TSCI on November 20, 2015, following convictions for second-degree forgery and assault by a confined person. Schroeder was placed at TSCI in 2007 and was serving a life sentence on convictions for first-degree murder, use of a deadly weapon to commit a felony, and six counts of second-degree forgery. Schroeder had spent a substantial amount of his sentence in a restrictive housing unit, and TSCI staff generally knew that both Berry and Schroeder had anger issues.

On April 10, 2017, Schroeder and Berry occupied their own cells in a restrictive housing unit. That day, the Defendant identified as John/Jane Doe 1 informed Schroeder that he would be double bunked with another inmate in the restrictive housing unit, unless Schroeder agreed to move out of his cell to different housing unit. The Defendant

---

[1] "Restrictive housing means conditions of confinement that provide limited contact with other offenders, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week[.]" Neb. Rev. Stat. § 83-170(13). Placement in restrictive housing is based on one or more of the following criteria: (1) a serious act of violent behavior directed at correctional staff and/or at other inmates; (2) a recent escape or attempted escape from secure custody; (3) threats or actions of violence that are likely to destabilize the institutional environment to such a degree that the order and security of the facility is significantly threatened; (4) active membership in a prison gang, accompanied by a finding, based on specific and reliable information, that the inmate either has engaged in dangerous or threatening behavior directed by the prison gang, or directs the dangerous or threatening behavior of others; (5) the incitement or threats to incite group disturbances in a correctional facility; and (6) inmates whose presence in the general population would create a significant risk of physical harm to staff, themselves, and/or other inmates. 72 Neb. Admin. Code § 1-003.02. Moser did not allege the reasons for Schroeder's or Berry's placement in restrictive housing.

identified as John/Jane Doe 2 separately informed Berry that he had the same option—agree to change cells or be subject to double bunking in the restrictive housing unit. Ostensibly, Schroeder and Berry both refused to move cells. See Am. Compl. ¶¶ 72-78, ECF No. 20, Page ID 89. Schroeder also told Doe 1 that he opposed sharing a cell with any other inmate. When Schroeder was informed that his cellmate would be Berry, Schroeder told Defendant Joann Helton, a TSCI case worker, that he opposed sharing a cell with Berry, specifically, because Schroeder knew Berry had "enemies, was talkative[,] and was believed to be dirty." Am. Compl. ¶¶ 73-5, ECF No. 20, Page ID 89. Minutes later, Brown and Haussler decided to double bunk Berry and Schroeder in the restrictive housing unit. Moser did not allege that Does 1 or 2 relayed Schroeder's comments to Brown or Haussler, nor did Moser allege that Brown or Haussler otherwise became aware of those comments.

Section VIII of NDCS Administrative Regulation Number 210.01 sets out the procedure unit managers must follow when making cell assignments for inmates in restrictive housing. Neb. Dep't Corr. Servs., Admin. Reg. 210.01 at 13-14, https://corrections.nebraska.gov/system/files/rules_reg_files/ar_210.01_2018.pdf. Section VIII(B) instructs unit managers to consider a non-exhaustive list of factors before making an assignment, including the inmates' history of assaultive behavior, the reasons for the inmates' restrictive housing status, and the inmates' aggression or vulnerability to aggression. Section VIII(G) requires the persons making the assignment to "state in writing why, at the time of the cell assignment, the cell assignment provides each cellmate with reasonable safety from assault." Brown and Haussler assessed Berry and

Schroeder's compatibility, but they failed to complete the written statement required by Section VIII(G).

After Brown and Haussler made their decision, Helton "expressed concerns," "stating [ ] she 'personally felt that it was not the best idea' since Berry 'was known to be very talkative and bothersome,' and that Schroeder 'in for life, with a temper would not want someone like' Berry as a cellmate." Am. Compl. ¶ 85, ECF No. 20, Page ID 90. Although, it is unclear to whom she made these statements. *See id.* Helton also contacted Dustin Gustafson, the acting Lieutenant, and expressed concern about Berry and Schroeder sharing a cell. Gustafson told her, "there wasn't much that could be done unless she called the person responsible for making the decision at their home." *Id.* at ¶ 86. Helton also expressed concern to two other unidentified TSCI staff members, and an investigation by the Office of Inspector General of the Nebraska Correctional System confirmed Helton knew Schroeder objected to sharing a cell with Berry.

Brown and Haussler's April 10, 2017, decision to double bunk Berry with Schroeder was not reversed; and, five days later, Schroeder fatally assaulted Berry in their cell.

Previously, in 2015, the Vera Institute of Justice (Vera) began working with NDCS "to curb its use of segregated housing." Am. Compl. ¶ 16, ECF No. 16, Page ID 83. On November 1, 2016, the Vera issued a report that found NDCS facilities, including the Tecumseh facility, were overcrowded and understaffed which increased the risk of inmate violence. The report also recommended that when inmates in restrictive housing were assigned to share a cell, NDCS should "always ensure [inmates] are carefully matched to minimize the risk of dangerous situations." Am. Compl. ¶ 54, ECF No. 20, Page ID 87.

4

TSCI had two inmate riots, one in May 2015 and one in March 2017, that resulted in inmate fatalities. Moser alleged that overcrowding, understaffing, and overuse of restrictive housing contributed to these riots. She also alleged that the Vera report and the riots made Defendants Scott Frakes, the director of NDCS, and Brad Hansen, the warden at TSCI, aware of a general risk of harm from inmate violence. In 2017, NDCS was operating at 160% of its design capacity, and the Tecumseh facility was operating at 107% of its design capacity of 960 inmates.

As the personal representative of Berry's estate, Telena Moser brought this action under 42 U.S.C. § 1983 alleging the Defendants violated Berry's Eighth Amendment rights. Moser sued the Defendants in their individual capacities only, and each moved to dismiss Moser's Eighth Amendment claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 29 & 35.

**STANDARD OF REVIEW**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this requirement, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv'rs Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015)

(quoting *Iqbal*, 556 U.S. at 678), *cert. denied*, 135 S. Ct. 2941 (2015). The complaint's factual allegations must be "sufficient to 'raise a right to relief above the speculative level.'" *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). The Court must accept factual allegations as true, but it is not required to accept any "legal conclusion couched as a factual allegation." *Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied*, 136 S. Ct. 804 (2016).

On a motion to dismiss, courts must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555 & 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).

**DISCUSSION**

**I.  Supervisory Liability—Frakes (Director of NDCS) and Hansen (Warden)**

"To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 676); *see also Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018). Vicarious liability is inapplicable in § 1983 cases, but

6

"a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Id.* (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)). A supervisor's personal involvement may also be found "if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)). In the Eighth Amendment context, "a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011) (quoting *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987)).

### A. Direct Action

"The Eighth Amendment 'requires prison officials to take reasonable measures to guarantee inmate safety by protecting them from attacks by other prisoners.'" *Patterson v. Kelley*, 902 F.3d 845, 851 (8th Cir. 2018) (quoting *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007)). "Yet a constitutional claim does not lie every time one inmate attacks another." *Id.* "[P]rison officials violate the Eighth Amendment 'only when they exhibit a 'deliberate or callous indifference' to an inmate's safety." *Id.* (quoting *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002)). Thus, "to prevail on a failure-to-protect claim . . ., an inmate must make two showings: '[1] an objective component, [that] there was a substantial risk of harm to the inmate, and [2] a subjective component, [that] the prison official was deliberately indifferent to that risk.'" *Id.* (alterations in *Patterson*).

Frakes and Hansen were not involved in the decision to double bunk Berry with Schroeder, and it cannot reasonably be inferred from the alleged facts that they were made aware of that decision, or the circumstances surrounding it, prior to Berry's death.

7

Thus, assuming the decision to double bunk Berry with Schroeder, specifically, posed a substantial risk of harm to Berry, Moser has not plausibly alleged that Frakes or Hansen was subjectively aware of the risk and disregarded it. *Patterson*, 902 F.3d at 851-52. Further, Moser's argument that the alleged facts show Frakes and Hansen failed to implement reporting procedures to make them aware of Berry's situation does not rise to deliberate indifference. *Id.* at 852 (stating that even "gross negligence . . . falls short of deliberate indifference as a matter of law") (citing *Tucker*, 276 F.3d at 1001). Therefore, Moser failed to allege a plausible failure-to-protect claim against Frakes and Hansen based on the specific risk of harm that Schroeder posed to Berry as a cellmate.

Moser argues she pled a plausible failure-to-protect claim against Frakes and Hansen because she alleged facts showing they were deliberately indifferent to the general risk of harm from inmate violence at TSCI due to overcrowding, understaffing, and overuse of restrictive housing. "[T]o have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant or defendants specifically knew about or anticipated the precise source of the harm . . . ." *Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002) (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). In *Farmer*, the Supreme Court explained that "a prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843. Thus, Frakes and Hansen's lack of awareness of the specific risk that Schroeder posed to Berry as a cellmate does not completely relieve them of

8

Eighth Amendment liability. *See id.*; *Patterson*, 902 F.3d at 851-52 (evaluating the plaintiff's claim that prison officials failed to protect him from a "general risk of harm").

Nevertheless, Moser's allegations must plausibly show that Frakes and Hansen were not only "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed," but that they "also dr[e]w the inference." *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (quoting *Davis v. Oregon Cty.*, 607 F.3d 543, 548-49 (8th Cir. 2010)); *see also Kulkay v. Roy*, 847 F.3d 637, 644 (8th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837) ("To show deliberate indifference via circumstantial evidence, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"). To make this showing, Moser relies on her allegation that Frakes and Hansen knew TSCI was at 107% of its designed capacity and her allegation that they knew the facility was generally understaffed and overused restrictive housing. These alleged facts show that Frakes and Hansen may have acted unreasonably by failing to remedy these conditions, but they do not make a plausible showing that Frakes and Hansen inferred that there was a substantial risk of serious harm to Berry. *See Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005) (finding that the plaintiff's allegations of overcrowding and understaffing demonstrated prison officials may have been negligent but did not "rise to the level of deliberate indifference"); *Patterson*, 902 F.3d at 852 ("gross negligence falls short of deliberate indifference as a matter of law").

Moser also relies on the May 2015 and March 2017 riots at TSCI to establish Frakes's and Hansen's deliberate indifference to a substantial risk of serious harm. "[I]solated incidents," however, "usually provide[ ] an insufficient basis upon which to

assign supervisor liability[ ]" on the theory of deliberate indifference. *Lenz v. Wade*, 490 F.3d 991, 995-96 (8th Cir. 2007) (quoting *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989)); *see also Patterson*, 902 F.3d at 852. Other than the two riots, there are no allegations of inmate violence at TSCI.[2] Although Frakes and Hansen were aware of the riots, Moser has not alleged facts which plausibly establish that Frakes or Hansen drew the inference that a substantial risk of an inmate attack existed at the relevant time.

Accordingly, the alleged facts do not state a plausible Eighth Amendment failure-to-protect claim against Frakes or Hansen based on their direct actions or inactions.

### B. Supervisor Liability

"A supervisor may be held individually liable under § 1983 'if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.'" *Laganiere v. Cty. of Olmstead*, 772 F.3d 1114, 1117 (8th Cir. 2014) (quoting *Wever v. Lincoln Cty.*, 388 F.3d 601, 606 (8th Cir. 2004)); *see also Marsh*, 902 F.3d at 754. Moser makes only conclusory allegations about a failure to train, and she alleged no facts showing that Frakes or Hansen "[r]eceived notice of a pattern of unconstitutional acts committed by subordinates" and "[d]emonstrated deliberate indifference to or tacit authorization of the offensive acts[.]" *Parris v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). She has, therefore, failed to allege a plausible Eighth Amendment claim against Frakes and Hansen based on a failure to supervise or train an employee.

### C. Policy-based Liability

---

[2] In her brief, Moser argues Frakes and Hansen were aware of a pattern of inmate assaults, but the Amended Complaint does not allege facts to support that argument.

10

"The authority of the state DOC director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983." *Jackson*, 747 F.3d at 544. With respect to prison wardens, the plaintiff "must plead facts to show that [the warden] was directly involved in making, implementing or enforcing a policy decision that 'create[d] unconstitutional conditions.'" *Id.* at 545.

The practice of double bunking is constitutional. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1042-43 (8th Cir. 2012) (citing *Bell v. Wolfish*, 441 U.S. 520, 538-41 (1979); *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Cody v. Hillard*, 830 F.2d 912, 916 (8th Cir. 1987)). Further, NDCS had policies in place, like Section VIII of NDCS Administrative Regulation Number 210.01, designed to avoid violence between inmates who share a cell. Thus, to the extent Frakes and Hansen were responsible for implementing a double-bunking policy, that policy decision is not a basis for liability in this case.

Other than alleging that Frakes and Hansen were "policymakers" and "final decision-makers," Am. Compl. ¶ 6, ECF No. 20, Page ID 82, and that they were responsible for the conditions at TSCI by virtue of their positions, Moser failed to allege which policy or policies they were "directly involved in making, implementing, or enforcing" that "created unconstitutional conditions." *Jackson*, 747 F.3d at 545.

## II.     Non-Supervisory Liability—TSCI Staff

Helton (case worker), Brown (unit manager), Haussler (unit manager), and Gustafson (acting Lieutenant) asserted the affirmative defense of qualified immunity.

"Qualified immunity protects public officials from § 1983 damage actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanley v. Finnegan*, 899 F.3d 623, 626-27 (8th

"The authority of the state DOC director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983." *Jackson*, 747 F.3d at 544. With respect to prison wardens, the plaintiff "must plead facts to show that [the warden] was directly involved in making, implementing or enforcing a policy decision that 'create[d] unconstitutional conditions.'" *Id.* at 545.

The practice of double bunking is constitutional. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1042-43 (8th Cir. 2012) (citing *Bell v. Wolfish*, 441 U.S. 520, 538-41 (1979); *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Cody v. Hillard*, 830 F.2d 912, 916 (8th Cir. 1987)). Further, NDCS had policies in place, like Section VIII of NDCS Administrative Regulation Number 210.01, designed to avoid violence between inmates who share a cell. Thus, to the extent Frakes and Hansen were responsible for implementing a double-bunking policy, that policy decision is not a basis for liability in this case.

Other than alleging that Frakes and Hansen were "policymakers" and "final decision-makers," Am. Compl. ¶ 6, ECF No. 20, Page ID 82, and that they were responsible for the conditions at TSCI by virtue of their positions, Moser failed to allege which policy or policies they were "directly involved in making, implementing, or enforcing" that "created unconstitutional conditions." *Jackson*, 747 F.3d at 545.

## II.     Non-Supervisory Liability—TSCI Staff

Helton (case worker), Brown (unit manager), Haussler (unit manager), and Gustafson (acting Lieutenant) asserted the affirmative defense of qualified immunity.

"Qualified immunity protects public officials from § 1983 damage actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanley v. Finnegan*, 899 F.3d 623, 626-27 (8th

Cir. 2018) (quoting *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine whether a public official is entitled to immunity, courts conduct a two-pronged analysis: 'whether the plaintiff has stated a plausible[3] claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction.'" *Kulkay*, 847 F.3d at 642 (quoting *Carter v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016)). Courts may decide "which of the two prongs of the qualified immunity analysis should be addressed first," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and "an official is entitled to qualified immunity unless both prongs are satisfied," *Kulkay*, 847 F.3d at 642. "[D]efendants seeking dismissal under Rule 12(b)(6) based on an assertion of qualified immunity 'must show that they are entitled to qualified immunity on the face of the complaint.'" *Carter*, 831 F.3d at 1107 (quoting *Bradford*, 394 F.3d at 1015).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "While 'clearly established law should not be defined at a high level of generality . . . it is not necessary, of course, that the very action in question has previously been held unlawful.'" *Thompson v. City of Monticello*, 894 F.3d 993, 999 (8th Cir. 2018) (quoting *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017)); *see also Ashcroft v. al—Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question

---

[3] The Defendants' plausibility arguments fit within the qualified immunity analysis.

12

beyond debate."). "[T]he dispositive question is whether there was a fair and clear warning of what the Constitution requires." *Thompson*, 894 F.3d at 1000 (quoting *City & Cty. of San Francisco v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1778 (2015).

When Schroeder fatally assaulted Berry, it was clearly established that prison officials violate the Eighth Amendment when they are deliberately indifferent to a known, substantial risk of harm posed by one inmate to another. *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014); *see also Young*, 508 F.3d at 875; *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000) ("Prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates.") (citing *Farmer*, 511 U.S. at 833). In this case, "the critical inquiry for qualified immunity purposes is whether it was 'objectively legally reasonable' for the prison official to believe that his conduct did not violate the inmate's clearly established Eighth Amendment right." *Curry*, 226 F.3d at 977 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see Morgan*, 920 F.3d at 523.

Although Moser thoroughly argued the plausibility of her Eighth Amendment claims, she did not directly respond to the assertion of qualified immunity; specifically, whether any of the Defendants violated a clearly established constitutional right. Instead, Moser argued qualified immunity is not appropriately raised at this time and that she "should be afforded the opportunity to conduct discovery, learn what happened to Mr. Berry and test these allegations through a motion for summary judgment." Pl.'s Br., ECF No. 39, Page ID 190. This argument fails because "[u]nless the plaintiff's allegations state a . . . violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Kulkay*, 847 F.3d at 646 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the Court must determine

13

whether Helton, Brown, Haussler, and Gustafson "are entitled to qualified immunity on the face of the complaint.'" *Carter*, 831 F.3d at 1107.[4]

### A. Brown and Haussler

Section VIII(B) of NDCS Administrative Regulation Number 210.01 requires unit managers to consider a non-exhaustive list of factors before making a cell assignment, including the inmates' history of assaultive behavior, the reasons for the inmates' restrictive housing status, and the inmates' aggression or vulnerability to aggression. At the time of their decision, Brown and Haussler knew Schroeder was in restrictive housing, that Schroeder had spent a substantial amount of his roughly ten years at TSCI in restrictive housing, and that Schroeder was originally convicted of first-degree murder. The TSCI staff also knew that Berry and Schroeder had anger issues.

Moser gives substantial weight to the fact that Schroeder's crime of conviction was first-degree murder and that he was regularly placed in restrictive housing. Yet in *Curry v. Crist*, the Eighth Circuit explained that "prison officials are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence." 226 F.3d at 978. The inmate aggressor in *Curry* also had a history of violent behavior, including threats of violence toward other inmates, but prison officials later made specific observations of the inmate's nonviolent conduct, and the inmate recanted

---

[4] At the summary judgment stage, it is the plaintiff's burden to demonstrate that the law was sufficiently clearly established. *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Monroe v. Ark. State. Univ.*, 495 F.3d 591, 594 (8th Cir. 2007)); *see also Littrell v. Franklin*, 388 F.3d 578, 584-85 (8th Cir. 2004) ("The issue of qualified immunity is a question of law for the court, rather than the jury to decide: '[I]t is the province of the jury to determine disputed predicate facts, the question of qualified immunity is one of law for the court.'") (alteration in original) (quoting *Peterson v. City of Plymouth*, 60 F.3d 469, 473 n.6 (8th Cir. 1995)).

14

his earlier threats of violence. Accordingly, the court did not find the prison officials liable for alleged Eighth Amendment violations. *Id.* at 978-79.

Although Brown and Haussler's knowledge of Schroeder's murder conviction alone does not rise to deliberate indifference to a substantial risk of harm, they failed to "state in writing why, at the time of the cell assignment, the cell assignment provide[d] each cellmate with reasonable safety from assault," as required by Neb. Dep't Corr. Servs., Admin. Reg. 210.01(VIII)(G). Given Schroeder's regular placement in restrictive housing and known behavioral problems, it is plausible that Brown and Haussler were deliberately indifferent to a substantial risk of harm posed by Schroeder to Berry. *See* 72 Neb. Admin. Code § 1-003.02 (listing the criteria upon which restrictive housing assignments are made). *See also Kulkay*, 847 F.3d at 644 ("To show deliberate indifference via circumstantial evidence, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'").

Therefore, the Court cannot conclude, from the face of the Amended Complaint, that Brown and Haussler did not violate a clearly established Eighth Amendment right.

**B. Helton and Gustafson**

Moser alleged Schroeder told Helton that "double bunking with Berry was unacceptable because he knew Berry to have enemies, was talkative[,] and was believed to be dirty." Am. Compl. ¶ 75, ECF No. 20, Page ID 89. Helton told other TSCI staff[5] she "personally felt that [double bunking Schroeder with Berry] was not the best idea" because

---

[5] It is unclear to whom Helton made these statements. *See* Am. Compl. ¶ 85, ECF No. 20, Page ID 90.

15

Berry "was known to be very talkative and bothersome," and because Schroeder was "in for life[ ] with a temper . . . ." *Id.* at ¶ 85, Page ID 90. She also contacted Gustafson, the acting Lieutenant, regarding the decision, and he told her "there wasn't much that could be done unless she called the person responsible for making the decision at their home." *Id.* at ¶ 86. There are no allegations that Helton attempted to notify Brown or Haussler of her concerns.

At this juncture, the Court cannot conclude that Schroeder's assault of Berry was a surprise to Helton and Gustafson because Helton allegedly was concerned about assigning Schroeder to a cell with Berry and she communicated her concern to Gustafson. *See Curry*, 226 F.3d at 978-79 (explaining prison officials are entitled to qualified immunity from a failure-to-protect claim "when an inmate was injured in a surprise attack by another inmate"). On these facts, it is plausible that Helton and Gustafson were deliberately indifferent to substantial risk of harm to Berry, and they have not shown, on the face of the Amended Complaint, that they did not violate a clearly established right.

### C.    John/Jane Does 1 and 2

No motion was filed on behalf of the Defendants identified as John/Jane Doe 1 and John/Jane Doe 2, nor have they been served with process.

Generally, "it is impermissible to name fictitious parties as defendants[,]" but "an action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *Estate of Rossenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (citing *Munz v. Parr*, 758 F.2d 1254 (8th Cir. 1985)).

According to the Amended Complaint, Does 1 and 2 were either employed by, or contractors for, NDCS and worked at TSCI. Am Compl. ¶ 7, ECF No. 20, Page ID 82. Doe 1 told Schroeder that he would be double bunked with another inmate unless he agreed to move to a different housing unit, and Doe 2 told Berry he had the same choice. These allegations are sufficiently specific to permit the identity of Does 1 and 2 to be ascertained after reasonable discovery. Once identified, Moser may file a second amended complaint, and she must serve the identified defendants with process unless service of process is waived. *See Munz*, 758 F.2d at 1257 ("[Plaintiff] should have then been permitted to amend the complaint and serve the identified defendant.").

**CONCLUSION**

Moser failed to allege a plausible Eighth Amendment claim against Frakes or Hansen, and they will be dismissed from this action. Moser's Eighth Amendment failure-to-protect claims against Brown, Haussler, Helton, and Gustafson are plausible, and they have not shown that they are entitled to qualified immunity on the face of the Amended Complaint. Finally, Moser will be permitted to identify Defendants John/Jane Doe 1 and 2 during the discovery process. Accordingly,

IT IS ORDERED:

1. The Motion to Dismiss, ECF No. 29, filed by Defendants Scott Frakes and Brad Hansen, is granted;

2. Defendants Scott Frakes and Brad Hansen are dismissed from this action;

3. The Motion to Dismiss, ECF No. 35, filed by Defendants Athena Brown, Dustin Gustafson, Todd Haussler, and Joann Helton, is denied;

4. Defendants Brown, Gustafson, Haussler, and Helton must respond to the Amended Complaint on or before July 31, 2019; and

5. If Defendants John/Jane Doe 1 and John/Jane Doe 2 are identified during discovery, Moser may file a second amended complaint and must serve that pleading on the identified individuals unless service of process is waived.

Dated this 17th day of March 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge